Filed 10/16/25  Marriage of C.C. and T.D. CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| In re the Marriage of C.C. and T.D. | D083820 |
| C.C., | |
| Respondent, | (Super. Ct. No. D351571) |
| v. | |
| T.D., | |
| Appellant; | |
| SAN DIEGO DEPARTMENT OF CHILD SUPPORT SERVICES, | |
| Respondent. | |

APPEAL from orders of the Superior Court of San Diego County, Adam Wertheimer, Commissioner.  Affirmed.

T.D., in pro. per., for Appellant.

No appearance for Respondent C.C.

Rob Bonta, Attorney General, Cheryl L. Feiner, Assistant Attorney General, Maureen C. Onyeagbako and Jennifer C. Addams, Deputy Attorneys General, for Respondent San Diego Department of Child Support Services.

## I. INTRODUCTION

T.D. (Father) owed C.C. (Mother) child support arrears (unpaid support and interest) dating back to 1994, which, with interest, grew to more than $245,000. When Mother requested in 2024 that the family court increase Father's monthly arrears payment from $150 to $1,000, Father requested equitable relief to set aside arrears for a period decades earlier (1994 to 2000) during which Father claims Mother concealed the children from him. The family court denied Father's request and granted Mother's. On appeal, Father contends the family court misapplied case law and equitable principles in denying his motion and lacked evidentiary support to grant Mother's request to increase his arrears payment. For reasons we will explain, we conclude Father's claims lack merit. Accordingly, we affirm the family court's orders.

## II. FACTUAL AND PROCEDURAL BACKGROUND

Father and Mother married in 1981 and had four children together — sons born in August 1983 and October 1985, and twin daughters born in December 1987. Mother filed for divorce in 1992.

In January 1994, Mother moved to establish child support arrears owed by Father. As of March 1994, arrears totaled $7,737.50. Father made no support payments from March 1994 to January 2000 and made payments only sporadically thereafter. The San Diego County Department of Child Support Services (the Department) became actively involved in child support matters in January 1998. In 2016, the family court ordered Father to pay

2

$150 per month toward arrears. As of November 2023, Father's arrears totaled $245,551.56 ($62,746.70 in principal and $182,804.86 in interest).

## A. Mother's Request to Increase Father's Arrears Payment

On August 30, 2023, Mother requested an order increasing Father's monthly arrears payment from $150 to $1,000 to "liquidate the arrears balance in a more reasonable time."[1] At the repayment rate of $150 per month, it would take Father well in excess of 100 years to pay off the arrears. At $1,000 per month, it would take Father more than 20 years. Father was 65 years old at the time of the hearing on Mother's request.

Father filed a responsive declaration opposing Mother's request. He asserted Mother "actively concealed the four children" from January 1994 to March 2000 by leaving the state without notifying him or providing new contact information. Father recounted his efforts to find his children. He searched for Mother through her work and "called every elementary school" in the Seattle area. "The DA's office child abduction unit told [Father] there was nothing [he] could do since [Mother] was [the] custodial parent." "Child support services told [him] there was no request to collect child support payments." Father also contacted Mother's parents, who told him " 'to leave their daughter alone' " and " 'she didn't want [him] to know where she was.' "

Father stated that Mother "hinder[ed]" his search efforts by remarrying and changing her last name, "chang[ing] her own name two more times," "illegally chang[ing] the children's last name," changing their address four times, and "chang[ing] the [children's] school six times in the first [five] years of concealment." Father argued his request for relief was supported by *In re Marriage of Boswell* (2014) 225 Cal.App.4th 1172 (*Boswell*), which held that a

---

[1] Mother also requested that the case be transferred to a different courthouse. That request, which the family court denied, is not at issue in this appeal.

3

custodial parent's active concealment for 15 years, followed by a 15-year delay in seeking support payments from the noncustodial parent, constituted unclean hands barring the custodial parent's request. (*Id*. at p. 1175.)

Father attached to his responsive declaration two other affidavits he filed in November and December 1994. In those, Father discussed visitation issues and alleged misconduct by Mother. In the December 1994 declaration Father explained he had not visited the children because he could not afford to pay for a visitation supervisor. Once Father could afford to pay a supervisor, the supervisor contacted Mother and reported to Father that Mother "did not feel [visitation] would be a good idea" because Mother "had recently been remarried and was plan[n]ing to move to Seattle Wash[ington] on Jan[uary] 1, 1995." Father requested a temporary restraining order "keeping the children in San Diego." It appears the court denied that request.

The Department also filed a responsive declaration to Mother's request to increase Father's arrears payment. The Department requested that any court order provide for "a reasonable payment sufficient to liquidate the arrearages in a reasonable amount of time."

The family court ordered the parties to submit additional briefing — Mother and the Department regarding Father's concealment claim, and Father regarding the merits of Mother's request to increase arrearage payments, and the timeliness of his own request to delete any amounts accrued between 1994 and 2000.

The Department argued in its supplemental filing that Father's concealment claim in 2023 was untimely because the court established arrears in 1994 and Father was "well aware of this judgment for years." The Department also argued Father failed to establish any of the elements of a

4

concealment defense — active concealment by the custodial parent until the children reach the age of majority, reasonably diligent location efforts by the noncustodial parent, and concealment rendering the noncustodial parent unable to pay. (See *In re Marriage of Damico* (1994) 7 Cal.4th 673, 685 (*Damico*); *In re Marriage of Comer* (1996) 14 Cal.4th 504, 517 (*Comer*).) The Department argued that any concealment ended before the children reached the age of majority, Father had not searched diligently, and Father was able to make support payments through the Department.

In her supplemental filing, Mother "agree[d] with" the Department's positions. She also denied she had concealed herself and the children. Mother stated she notified Father and the court of her move by certified letter dated November 1, 1994, which was not returned as undeliverable. The letter states in substantive part: "This letter shall serve to notify you that I intend to move the residence of our children . . . out of the State of California effective January 1, 1995." Mother stated she moved with the children to Washington on January 6, 1995. Mother denied changing names to conceal the children — Mother changed her name in 1994 when she remarried, the eldest son changed his own name when he turned 18 in 2001, the younger son changed his own name when he turned 18 in 2003, one of the daughters changed her name when she got married in 2022, and the other daughter never changed her name. Mother stated she also sought child support enforcement assistance from a Washington agency in 1995.

Father did not file a further response, even though directed to by the family court.

On January 17, 2024, the family court heard Mother's motion to increase Father's arrearage payments. The court rejected Father's concealment defense on several grounds. Procedurally, the court denied

the "equitable defense" as untimely because Father first litigated the issue "20 years after the fact." Father responded that he had been "bring[ing] it up" at "[e]very single hearing," and that he "didn't know [he] needed to file a separate motion until 2016" when *Boswell* was decided.[2] Even still, the court found Father was "not diligent" by waiting until 2023 to raise the *Boswell* case. On the merits, the court rejected the defense because Father located the children while they were all still minors.

After determining it would increase the amount of Father's arrears payment, the court discussed with the parties how best to determine the increased amount. The court observed that with interest accumulating on the outstanding arrears at about $520 per month, the current payment of "$150 will not touch this balance." Father stated he lives on $1,260 per month and could not afford a higher payment. The court confirmed that Father had elected to start drawing early on his social security retirement benefits, which would decrease if he were to earn more than $21,000 from other sources. Based on the court's familiarity with "how easy it is to become employed at this time," the court surmised Father could find a job that paid $18 per hour, which would nearly triple Father's current income. At that rate, the court posited that "even if the [Department] took half [Father's] income, which they can," Father's remaining anticipated earnings would still exceed his current income. The court continued the hearing to give Father time to find a job.

## B. Father's Request to Correct Legal Error

In the meantime, Father applied ex parte to request a hearing before the further arrears proceeding "in order to correct a legal error." "The basic

---

2       *Boswell* was decided in 2014.

error" Father asserted was the family court's failure to address his unclean hands argument under *Boswell*.

The court heard Father's request on March 6, 2024. As to unclean hands, Father pointed out that while the family court found his 20-year delay untimely, the *Boswell* court entertained an unclean hands defense raised 25 years after the fact and "overrule[d]" the holding in *Damico* that a concealment claim fails if the children are located before they reach the age of majority. Father reargued his claim that Mother moved without providing notice and changed the children's names and schools.

The court responded that "*Boswell* is not strictly a concealment case" — "it's talking about equity and about how the court would review equity, and the facts . . . were particularly egregious" because the custodial parent concealed the children for 15 years and then waited another 15 years to request arrears. Here, by contrast, the court observed that Mother allegedly "disappeared" for only five or six years, there was continuing litigation between the parties during some of her absence, Father had not exercised his visitation, Father "did not act reasonably in terms of trying to locate the children,"[3] there had been court orders against Father, and there had been multiple findings of arrears throughout. The court expressly found Mother "was not actively concealing the children" and was credible in connection with the earlier hearing, including about having provided notice to Father regarding the move and about not changing the children's names.[4] The court

---

[3] Specifically, the court stated that "a school is not going to give a stranger on the telephone any information with respect to a student" and "there are various other remedies . . . and . . . ways that a person can locate other individuals" that Father "did not take advantage of."

[4] The court found Father's name-change theory was based on "hearsay information that hasn't been presented to the court properly."

7

found these facts "significantly different than *Boswell*" and "not terribly egregious — except the fact that the kids had to live without support from their father for the majority of their minority."

## C.  Increased Arrears Payment Amount

Father filed an updated income and expense declaration in advance of the continued hearing to fix the amount of his arrears payments.  This declaration showed Father found work and was earning $22.50 per hour and had monthly average income of $3,010, plus $1,530 in monthly social security benefits.  Father claimed monthly expenses of $4,236.

The court heard the continued matter on April 24, 2024.  Father reiterated that his social security benefits would decrease 50 percent for each dollar he earned over $21,000.  The court responded that Father's social security benefit was already at a reduced amount because Father "chose to take it early."

Based on Father's age (65) and the outstanding arrears balance, the court calculated that a $500 monthly payment would take over 46 years to repay (putting Father at 111 years old) and a $1,000 payment would take 22 years (putting Father at 87 years old).  Considering its "duty to make an order best as possible to have [the arrears] paid off," the court ordered Father's arrears payments increased to $1,000 per month.

## III.  DISCUSSION

### A.  The Family Court Did Not Err in Rejecting Father's Equitable Request to Abate Arrears

Father contends the family court erred in denying his equitable request to abate arrears during the period of alleged concealment because the family court judge misunderstood the law and misapplied it to the facts of this case. We disagree.

8

### 1. Father Failed to Establish a Concealment Defense Under *Damico* and *Comer*

As a general matter, a custodial parent's interference with a noncustodial parent's visitation does not excuse the noncustodial parent from paying child support. (See Fam. Code, § 3556 ["The existence or enforcement of a duty of support owed by a noncustodial parent for the support of a minor child is not affected by a failure or refusal by the custodial parent to implement any rights as to custody or visitation granted by a court to the noncustodial parent."]; *Damico, supra*, 7 Cal.4th at p. 679.)

A very narrow exception to this general rule applies when the custodial parent's misconduct crosses the line from mere interference with visitation to active concealment. In *Damico*, the Supreme Court held that a custodial parent "is estopped from later collecting child support arrearages for the time of the concealment" if the custodial parent (1) "actively conceal[ed] him or herself and the child from the noncustodial parent until the child reache[d] the age of majority,"[5] (2) the custodial parent and child remained concealed "despite reasonably diligent efforts by the noncustodial parent to locate them," and (3) the custodial parent's active concealment rendered the noncustodial parent unable to pay child support during the concealment period. (*Damico, supra*, 7 Cal.4th at p. 685.) The Supreme Court clarified in *Comer* that "concealment [that] ends when the child is still a minor . . . does not establish a defense to an action . . . for child support arrearages." (*Comer, supra*, 14 Cal.4th at p. 517.) We review the factual findings underlying the

---

[5]   *Damico* involved a child who reached majority before the concealment ended. (*Damico, supra*, 7 Cal.4th at p. 685.) The court left open the question of whether a concealment defense will lie if the concealment ends while the child is still a minor. (*Ibid.*)

family court's findings on these elements for substantial evidence. (*Damico*, at p. 684.)

Substantial evidence supports the family court's findings that Father failed to establish any of the elements of a concealment defense. On the threshold finding that Mother did not actively conceal herself and the children, Mother presented evidence that she notified Father by certified letter that she intended to leave California. Although the letter did not state where Mother intended to move or that she had remarried, Father stated in his December 1994 declaration that he had learned from a visitation supervisor that Mother had remarried and that she intended to move to Seattle in January 1995. Thus, by the time Mother moved with the children, Father already knew Mother remarried and intended to move to Seattle. Mother also explained that while she changed her own name when she remarried, she did not change the children's names — some of them changed their name on their own only after turning 18 or marrying. The court found Mother's testimony credible. Substantial evidence thus supports the family court's finding that Mother did not actively conceal herself and the children. (See *In re Marriage of Wozniak* (2020) 59 Cal.App.5th 120, 135 ["the testimony of a single witness can provide the substantial evidence necessary to support a finding of fact"].)

Substantial evidence also supports the family court's findings that Father failed to establish the remaining elements of a concealment defense. First, Father's own admissions in his appellate briefing and in the family court show that any concealment ended in March 2000, months before the oldest child turned 18. Second, the court could reasonably conclude that Father calling schools in the Seattle area and his claim to have contacted an unspecified DA's office and child support agency were not reasonably diligent

10

considering his failure to use other available location methods. Finally, because the Department was actively involved in pursuing child support from Father and Father kept in touch with Mother's parents during the concealment period, the family court could reasonably conclude any alleged concealment did not render Father unable to make child support payments. (See *Comer*, *supra*, 14 Cal.4th at p. 527 ["Child support payments may be made to the [child support agency] in the county that rendered the support order, or may be placed in a trust account . . . accessible to [the custodial parent] or to intermediaries, such as [the custodial parent's] parents, with whom [the noncustodial parent] . . . kept in contact"].)

## 2. The Family Court Did Not Misapply *Boswell*

Father contends the family court misunderstood and misapplied *Boswell*, *supra*, 225 Cal.App.4th 1172, which Father maintains recognized a concealment defense based on unclean hands. Father's heavy reliance on *Boswell* is misplaced.

In *Boswell*, after the family court ordered the noncustodial father to pay child support, the custodial mother " 'disappeared' " with her two children — "[s]he moved from California, changed the children's names, and did not notify [the] father of their new addresses." (*Boswell*, *supra*, 225 Cal.App.4th at p. 1174.) The father "did not see the children for approximately 15 years, almost their entire minority." (*Ibid*.) After the older child "reached the age of majority, mother 'gave' custody of [the younger child] to [the] father in 1998 when he was 16 years old. He lived with [the] father until he reached majority." (*Ibid*.) "Fifteen years after that," when "the children were over 30 years old," the "mother sought to enforce the child support order" and recover more than $92,000. (*Ibid*.) The family court denied the request, "specifically rul[ing] that doing so would be 'inequitable,'

that the request was 'untimely,' 'unjust' and '[t]his is just a terribly egregious situation." (*Ibid.*)  The Court of Appeal affirmed.

The *Boswell* court began its four-page opinion by discussing general "fairness/equity principles" — that family law courts are courts of equity, those who seek equity must come with clean hands, and family law courts hearing equitable matters " ' "must have the ability to exercise discretion to achieve fairness and equity." ' " (*Boswell*, *supra*, 225 Cal.App.4th at pp. 1174–1175, capitalization & italics omitted.)  The court then cursorily addressed the substance of the mother's appeal:

> We need not dwell upon or explicate in detail underlying principles of "active concealment," "estoppel," or "retroactive modification of child support."  The only issue here is whether the trial court should have used judicial power to achieve an "inequitable result." . . . It is sufficient to observe that mother did actively conceal the children.  This equitably estops her from enforcing a child support judgment.  [*Damico*, *supra*, 7 Cal.4th at pp. 682–683.]
>
> The trial court found that mother had been "unjust" in her unilateral decision to remove father from the children's lives.  This is tantamount to a finding of "unclean hands." . . . . "These are some of the dirtiest hands we have seen."  (*Boswell, supra*, 225 Cal.App.4th at p. 1175, citations omitted.)

Reiterating the family court's finding that the mother's conduct "was 'terribly egregious,' " and characterizing the unclean hands doctrine as "the most important rule affecting the administration of justice," the *Boswell* court held that "a family law court, in the exercise of its broad equitable discretion, and upon a finding of 'unclean hands,' may decline to enforce a child support arrearage judgment."  (*Boswell*, *supra*, 225 Cal.App.4th at p. 1175.)

12

Here, Father contends the family court misunderstood *Boswell* because the family court said it "is not a concealment case," when "the *Boswell* decision itself says otherwise." Father misstates the family court's characterization of *Boswell*. To begin, the family court said, "*Boswell* is not *strictly* a concealment case" and that while "there was concealment" in *Boswell*, it did "not mak[e] new law relative to concealment." (Italics added.) Indeed, the *Boswell* court itself acknowledged it did "not dwell upon or explicate in detail underlying principles of 'active concealment.' " (*Boswell*, *supra*, 225 Cal.App.4th at p. 1175.) Not surprisingly, then, Father does not cite, and we have not found, any published case law citing *Boswell* as a concealment case. Moreover, to the extent *Boswell* may conflict with *Damico* and *Comer* by allowing a concealment defense where the concealment ended before a child reached majority, we are of course bound by Supreme Court precedent.[6] (See *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 ["Courts exercising inferior jurisdiction must accept the law declared by courts of superior jurisdiction."].) Contrary to Father's argument to the family court, *Boswell* did not "kind of overrule[]" *Damico* — it cannot. The family court thus correctly observed that "the main [concealment cases] are *Damico* and *Comer*," which are "not even discussed in the *Boswell* case."

Reframing *Boswell*, the family court characterized the case as "talk[ing] about equity and about how the court would review equity." We agree with

---

6      *Boswell* may well be consistent with *Damico*. The older child in *Boswell* reached majority before the concealment ended (thus allowing a concealment defense), and the mother " 'gave' " the younger child to the father while the child was still a minor. (*Boswell*, *supra*, 225 Cal.App.4th at p. 1174.) A leading treatise posits that "[h]ad this [latter fact] not occurred, the support obligor [i.e., the noncustodial father] most likely would have been liable for the support arrearages pursuant to *Comer*." (Hogoboom and King, California Practice Guide: Family Law (The Rutter Group 2025) ¶ 7:608.)

this characterization. (See *Boswell*, *supra*, 225 Cal.App.4th at p. 1175 [discussing the family court's fact-specific "exercise of its broad equitable discretion" in a case involving " 'terribly egregious' " misconduct].) Indeed, *Boswell* illustrates the deferential standard of review that applies to a family court's exercise of its equitable powers. (*Keith G. v. Suzanne H.* (1998) 62 Cal.App.4th 853, 861–862 ["the trial court has discretion to determine the appropriate means of enforcing a judgment for child support" and "can . . . and should take the equities of the situation into account"].) "Generally, where a trial court has discretionary power to decide an issue, an appellate court is not authorized to substitute its judgment of the proper decision for that of the trial judge. The trial court's exercise of discretion will not be disturbed on appeal in the absence of a clear showing of abuse, resulting in injury sufficiently grave as to amount to a manifest miscarriage of justice. [Citations.] ' "The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court." ' [Citations.] The burden is on the complaining party to establish abuse of discretion. [Citations.] The showing on appeal is insufficient if it presents a state of facts which simply affords an opportunity for a difference of opinion." (*In re Marriage of Rosevear* (1998) 65 Cal.App.4th 673, 682; see *Heidi S. v. David H.* (2016) 1 Cal.App.5th 1150, 1162–1163.) With this deferential standard of review in mind, we turn now to Father's claims that the family court erred in its application of the equitable principles discussed in *Boswell* to the evidence in this case.

Father contends the family court improperly weighed the equities by overlooking the evidence he produced to show he diligently searched for

Mother and the children. But the court explained it found Mother's testimony credible and Father's evidence unpersuasive on the concealment issue. " 'The trial judge, having heard the evidence, observed the witnesses, their demeanor, attitude, candor or lack of candor, is best qualified to pass upon and determine the factual issues presented by their testimony.' " (*In re Marriage of Lewin* (1986) 186 Cal.App.3d 1482, 1492; see *Boswell, supra*, 225 Cal.App.4th at p. 1176 ["We hold that where . . . the family law court makes a fair and equitable ruling on contested issues of fact, its express or implied factual determinations are binding on appeal"].)

Father also contends the court did not consider the equities properly when it drew negative inferences against him based on alleged misconduct (restraining orders, injunctive orders, and restricted visitation orders) that Father asserts was unrelated to the concealment issue before the court, and which actually arose from Mother's conduct, not Father's. The appellate record does not substantiate Father's claim. The only evidence in the record on these points is Father's declarations from 1994, which do not elaborate on the historic events. By contrast, the family court stated it had personally presided over this case for about 20 years and "went back and . . . read the [600 page] history of this case back to 1992" to refamiliarize itself with the litigation. We will not presume the court was mistaken.

At bottom, the family court explained to Father why "the facts of *Boswell* do not fit to the facts of [his] case" — "This situation is not terribly egregious except the fact that the kids had to live without support from their father for the majority of their minority. That's why the arrears are what they are today." (Cf. *People v. Thomas* (1992) 2 Cal.4th 489, 516 ["When we decide issues of sufficiency of evidence, comparison with other cases is of limited utility, since each case necessarily depends on its own facts."].)

15

Under the applicable deferential standard of review, the family court did not abuse its discretion.

## B. The Family Court Acted Within Its Discretion in Increasing the Arrears Payment Amount

Father contends the family court erred by increasing his arrears payment to $1,000 per month because Father's income and expense declaration showed he could not afford the payment. We are not persuaded.

When Mother brought her request to increase the amount of Father's arrears payment, Father's monthly income consisted entirely of $1,206 in social security retirement benefits. Father did not assert at that time that he was unable to meet his monthly expenses on this income. The court surmised Father could find a job that would nearly triple his income and accommodate an increased arrears payment. But rather than rest on that belief, the court continued the proceeding to give Father an opportunity to actually find work. Father did so, finding a job that increased his average monthly earnings to $3,010, plus $1,530 in monthly social security benefits. The family court determined this was sufficient to accommodate an increased arrears payment, which the court found was necessary to ensure the arrears would be repaid within Father's reasonably expected lifetime.

Father argues the family court failed to consider his monthly expenses of $4,236. Yet Father does not explain how we was able to manage those expenses a few months earlier when his income consisted entirely of social security benefits. In light of Father's apparent dramatically inflated monthly expenses, we conclude the family court acted within its discretion in determining Father's increased income was a sufficient basis upon which to increase the amount of his monthly arrears payment.

Father's reliance on *In re Marriage of Schulze* (1997) 60 Cal.App.4th 519 is misplaced because the family court there erred by ordering support that consumed more than 83 percent of the payor's monthly income based on a dramatic overstatement of the payor's actual income due to the court's use of incorrect software and erroneous assumptions about the taxable status of certain employer-provided benefits.  (*Id*. at p. 522.)  The family court here made no similar foundational errors.

## IV.  DISPOSITION

The orders are affirmed.  Respondents are entitled to their costs on appeal.

RUBIN, J.

WE CONCUR:

O'ROURKE, Acting P. J.

DATO, J.